UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ROOFERS LOCAL 149 PENSION FUND**, | 2:19-cv-10628 |
| Plaintiff, | HON. TERRENCE G. BERG |
| v. | |
| **KAIJA MENYON PACK and DIANA PERRY**, | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

As a member of Roofers Local 149, Charles Edwards, Jr. left a monthly annuity benefit to his wife when he died. Unfortunately, because of irregularities in finalizing an earlier divorce, he also left a dispute between two women as to which of them was the wife legally entitled to payments as his surviving spouse. Seeking to resolve these competing claims, the Trustees of the Roofers Local 149 Pension Fund (the "Fund") filed this interpleader action to sort out the rights of Defendants Diana Perry ("Perry") and Kaija Menyon Pack ("Pack"), both of whom were married to Edwards and claim to be his legal surviving spouse.[1] The case is now before the Court on a motion for summary judgment filed by the Fund. The Court held an evidentiary hearing on March 4, 2020, during

---

[1] Rule 22(a)(1) of the Federal Rules of Civil Procedure permits a party to join individuals as defendants if they "may expose a plaintiff to double or multiple liability."

which both Perry and Pack gave testimony. The Court ordered the Fund to submit supplemental briefing incorporating that testimony and provided Perry and Pack an opportunity to do the same. Initially, only Perry filed a supplemental brief. ECF No. 26. But Pack later filed a response to the allegations contained in Perry's brief. ECF No. 28. The Court has considered both Defendants' filings. Having determined that Pack is the surviving spouse for purposes of the pension plan, the Court will grant summary judgment in favor of the Fund.

## BACKGROUND

The Roofers Local 149 Pension Fund (the "Fund") is established and administered pursuant to Section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186, and the Employee Retirement Income Security Act of 1971 ("ERISA"), 29 U.S.C. § 1001 *et seq*. According to the Fund's pension plan, the "surviving spouse" of a participant who dies before retirement is eligible to receive a monthly survivor annuity benefit.[2] *See* ECF No. 20-2 (Excerpt from Am. and Restatement of Roofers Local No. 149 Pens. Plan). *See also* ECF No. 20-2, PageID.124 (supplying a definition of "Spouse or Surviving Spouse"). As a member of Roofers Local 149 who contributed to the Fund and passed away before his retirement, it is undisputed that Edwards's surviving spouse is entitled

---

[2] The plan also gives participants the option of selecting a beneficiary other than their spouse. Edwards did not opt to make such a designation. *See* ECF No. 20-2, PageID.121–22; ECF No. 20, PageID.101–02.

to receive death benefits under the plan. *See* ECF No. 20, PageID.104 (Fund's Mot. for Summ. J. Br.). The only dispute is whether Diana Perry or Kaija Menyon Pack—both of whom were married to Edwards—should legally be considered Edwards's "surviving spouse."

Perry was Edwards's first wife. A marriage certificate issued by Wayne County, Michigan shows that Edwards and Perry were married on August 18, 1979. ECF No. 1-1, PageID.8. The couple lived together for almost a decade and had one child together. ECF No. 24, PageID.169 (Mar. 1, 2020 Evid. Hearing Tr.). During the evidentiary hearing on this matter, Perry testified that she and Edwards separated around 1987. ECF No. 24, PageID.170–71.

In 1993, Edwards filed an action to divorce Perry in Michigan's Third Judicial Circuit Court. ECF No. 1-2, PageID.10 (Mich. Third Jud. Cir. Ct. Reg. of Actions). But that complaint was ultimately dismissed for failure to submit a judgment of divorce. ECF No. 1-3, PageID.12 (Order Dismissing Case). The Wayne County divorce between Edwards and Perry was thus never finalized. Though it remains possible that Edwards obtained a divorce in some other county or state (he apparently resided in New York and Pennsylvania during the relevant period), there is no evidence in the record that he did so. ECF No. 28, PageID.331.

An affidavit recently provided by Perry and Edwards's daughter avers that, while Edwards was in the hospital recovering from a stroke in 2017, he told his daughter that he had never divorced Perry. ECF No.

3

26-2, PageID.311 (Perry-Tate Aff.). The daughter in her affidavit asserts that she made a tape recording of this statement. ECF No. 26-2, PageID.311 (Perry-Tate Aff.). But that recording has not been provided to the Court and the Court therefore does not consider it in deciding summary judgment. Further, the Court notes that Perry testified during the hearing and never mentioned this 2017 conversation between Edwards and his daughter. To the contrary, Perry testified that she first learned that she and Edwards remained married when she searched Wayne County's divorce records in 2018 (in preparation for applying for Edwards's surviving spouse benefits). *See* ECF No. 24, PageID.173, 176.

In 1991, before Edwards unsuccessfully filed for divorce from Perry, he married Pack in a ceremony at Detroit's Linwood Church of Christ attended by 365 guests. ECF No. 1-4, PageID.14; ECF No. 28, PageID.326 (Perry Br.). The Wayne County marriage license states that Edwards had previously been married. ECF No. 20-4, PageID.129. Pack testified that Edwards told her he was divorced. ECF No. 24, PageID.189. When Wayne County issued a marriage license to Pack and Edwards, Pack understandably assumed there were no legal impediments to their marriage. ECF No. 24, PageID.189–90. According to Pack, she and Edwards remained happily married until his passing in 2018. The couple had several children together, both biological and adopted. ECF No. 24, PageID.200–01. Pack explains that she and Edwards also remained in close touch with his daughter born during his marriage to Perry and were

on fine terms with Perry. ECF No. 28, PageID.327. During their marriage, Pack and Edwards shared household expenses, combined finances, and listed each other as beneficiaries on benefits to which they were entitled. ECF No. 24, PageID.209–10. The couple also moved together several times to follow prospects for better neighborhoods and schools, academic opportunities for their children, and professional promotions. ECF No. 24, PageID.192–99.

Perry says she heard only through the grapevine that Edwards had married Pack. ECF No 24, PageID.173. But Pack testified that Perry actually was a guest at the Edwards-Pack wedding. ECF No. 24, PageID.192–93. According to Perry, she was never served with divorce papers and had not heard that Edwards was seeking a divorce. ECF No. 24, PageID.183. Nonetheless, Perry testified that she assumed from the fact that Edwards had married Pack that she and Edwards must have been divorced. ECF No. 24, PageID.183. For her own part, Perry also re-married. In 1998, Perry married Kenneth J. Day; the couple's 1998 marriage license indicates that Perry had previously been married. ECF No. 20-6, PageID.134. To this day, Perry and Day remain legally married, although they separated in 2004. ECF No. 24, PageID.174–75. In 2011, Perry moved in with her and Edwards's daughter. ECF No. 26, PageID.298.

During the evidentiary hearing, Perry testified that she and Edwards both stayed with their daughter at the daughter's home in

Michigan during some portion of 2016 and 2017. ECF No. 24, PageID.177. Perry's testimony suggested that this living arrangement was a temporary, mutually beneficial situation and by no means a reconciliation between Perry and Edwards. Pack's testimony also framed Edwards's stay with his daughter and Perry in 2016 and 2017 as more of a "visit." *See id.* at PageID.199–202. *See also* ECF No. 28, PageID.329 ("When [Edwards] would stay at [his and Perry's daughter's] house, [Edwards] slept in the basement on a small couch, it was only temporary so he said it was no big deal."). Pack explained that Edwards was travelling back-and-forth between Michigan and Indiana, where Pack had relocated for a job but had not yet secured a permanent living situation. ECF No. 24 at PageID.199–202. According to Pack, Edwards had "some work to do in Detroit" and so it was convenient to stay there and spend time with his daughter. *Id.* But Perry now asserts, in supplemental briefing and affidavits, that the reason Edwards moved back in with her and the couple's daughter was that he and Pack were having marriage trouble. ECF No. 26, PageID.298 (Perry Suppl. Br.); ECF No. 26-1, PageID.309 (Perry Aff.) (stating that Edwards moved in with his and Perry's daughter in 2015, as opposed to 2016); ECF No. 26-2, PageID.311 (same).

Edwards was still living with Perry and her daughter in Michigan when he suffered a stroke in August 2017. *See* ECF No. 24, PageID.200, 203; ECF No. 26, PageID.298. He was initially hospitalized in Michigan,

but Pack travelled with him back to Indiana after he was discharged. ECF No. 24, PageID.200. Perry apparently did not visit or keep in touch with Edwards after he left Michigan. *See id.* at PageID.177–78. Pack's testimony was that she and Edwards resided in Indiana from that point until his death in 2018. *Id.* at PageID.203. Edwards was in a nursing home for most of that time. ECF No. 28, PageID.330. Pack and Edwards's son helped care for Edwards because after his stroke he was unable to walk, feed himself, or carry out other basic functions independently. ECF No. 24, PageID.203. According to Pack, the exception to Edwards's residency in Indiana was a period of two or so days during February 2018 when Perry's daughter by Edwards transported him from his nursing home in Indiana to Michigan "against his will and under false pretense." ECF No. 28, PageID.330. The facts underlying this incident, although hotly disputed by the Defendants, are nonetheless immaterial to assessing whether Perry or Pack is the "surviving spouse" for benefits purposes.

Edwards passed away on August 1, 2018, by Pack's side in Indiana. ECF No. 20-8 (Death Certificate); ECF No. 28, PageID.331. The death certificate identifies Pack, not Perry, as his wife. ECF No. 20-8, PageID.147. Although she was legally married to *Day* at the time Edwards died, it was Perry who reported *Edwards's* death to the Fund and applied for death benefits as his surviving spouse. *See* ECF No. 20-9 (Cert. of Beneficiary Form). Perry testified that she decided to apply for

7

Edwards's benefits after examining Wayne County's divorce records and discovering that her divorce with Edwards was never finalized there. ECF No. 24, PageID.173. Perry believes she should be awarded the surviving-spouse benefits because she spent ten years of her life with Edwards and was legally married to him at the time of his death. ECF No. 24, PageID.176. At no point during her hearing testimony did Perry suggest she should be awarded the surviving spouse benefits on the basis that she and Edwards had reconciled in some manner in 2015–17, or because Pack had abandoned Edwards.

Pack in turn says that she is entitled to the surviving-spouse benefits because she married Edwards in good faith and built a life with him that the couple shared from the date of their marriage in 1991 until Edwards's death in 2018. ECF No. 24, PageID.210–11 (Pack testified, "So all I know is I married him. I've never married anybody else. I've never considered marrying anyone else. We married to death do us part, and that's what happened, death did us part.").

In her recent supplemental briefing, Perry for the first time alleges that Pack abandoned Edwards during the last years of his life. ECF No 26. Attached to Perry's brief are records from an Indiana criminal court indicating that Pack was charged, in October 2017, with neglect of a dependent, property theft, and exploitation of an endangered adult over 60 years of age. *See generally* ECF No. 26-3. Those charges, which do not expressly reference Edwards, were later dismissed. *Id.* Notably, Perry's

8

sworn affidavit, although attached as an exhibit to the supplemental brief, does not contain any mention of this alleged neglect or abuse of Edwards by Pack, nor did Perry mention any such wrongdoing by Pack in her hearing testimony. *See* ECF No. 26-1. Only the affidavit provided by Edwards and Perry's daughter contains sworn statements that Pack abandoned Edwards near the end of his life, around October 2017 (when Edwards was moved to a nursing home in Indiana). ECF No. 26-2, PageID.311. Edwards passed away approximately 10 months later, on August 1, 2018. ECF No. 20-8.

The Fund filed this lawsuit in March 2019 seeking the Court's assistance in determining whether it should award death benefits to Perry or to Pack. In its motion for summary judgment, the Fund acknowledges that Pack's marriage to Edwards was technically void *ab initio* because he was still married to Perry. Yet the Fund also argues that under Michigan law there is a strong presumption in favor of the validity of "a later ceremonial marriage that is attacked on the ground that one of the parties was already married to another." ECF No. 20, PageID.108. Applying this presumption of validity, the Court will award the Fund's surviving-spouse benefits to Pack.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A fact is

material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In deciding a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted). The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

Under Rule 56, "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, [and] set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). Because hearsay evidence would be inadmissible at trial, a district court cannot consider hearsay in deciding a motion for summary judgment. *Wiley v. United States*, 20 F.3d 222, 225–26 (6th Cir. 1994); *N. Am. Spec. Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997)

10

("The above testimony cannot create a genuine issue of material fact because it is inadmissible hearsay.").

## DISCUSSION

The dispositive question in this case is whether Perry or Pack is the "surviving spouse" for purposes of awarding benefits under the Fund's pension plan. Federal courts have jurisdiction over an interpleader action seeking to determine the proper beneficiary of benefits distributed under an ERISA employee-welfare plan. 29 U.S.C. § 1132; *Cent. States, Se. & Sw. Areas Pension Fund v. Howell*, 227 F.3d 672, 674 n.2 (6th Cir. 2000). When adjudicating a dispute about the proper beneficiary for ERISA benefits, ERISA "supplies the rule of law" for making that determination. *Metro. Life Ins. Co. v. Pressley*, 82 F.3d 126, 129–30 (6th Cir. 1996). *See* 29 U.S.C. § 1001 *et seq.*

That statutory scheme requires that a plan administrator award benefits "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). The Sixth Circuit has interpreted this language as establishing "a clear mandate that plan administrators follow plan documents to determine the designated beneficiary." *Pressley*, 82 F.3d at 130 (citing *McMillan v. Parrott*, 913 F.2d 310, 312 (6th Cir. 1990)). *See Union Sec. Ins. Co. v. Blakeley*, 636 F.3d 275, 276 (6th Cir. 2011) (emphasizing that ERISA "underscores the primacy of the written plan" documents). Accordingly, to the extent the plan documents provide an answer regarding the proper beneficiary of the pension plan, the Court

should rely on those documents to settle the dispute. *IBEW Pac. Coast Pension Fund v. Lee*, 462 F. App'x 546, 548, 2012 WL 447490, at *2 (6th Cir. 2012) (unpublished).

Here, the written pension plan provides some guidance on identifying the correct beneficiary. The plan provides that "[a] married Participant's Surviving Spouse (as defined in Article I) shall be eligible to receive a Qualified Pre-Retirement Survivor Annuity if such Participant dies prior to his actual retirement date . . . ." ECF No. 20-2, PageID.121. Article I then defines "Surviving Spouse":

> **Spouse or Surviving Spouse** shall mean: (a) the Participant's legal Spouse at the time the Participant's benefit payments commence; or (b) the Participant's legal Surviving Spouse to whom he had been married during the 1 year period preceding the Participant's date of death in the case of benefits payable as a Qualified Pre-retirement Survivor Annuity, as set forth in Section 6.1 A former Spouse will be treated as the Spouse or Surviving Spouse to the extent provided under the Qualified Domestic Relations Order, as described in Section 414(p) of the Internal Revenue Code.

ECF No. 20-2, PageID.124.

Accordingly, the terms of the pension plan provide that to comply with ERISA's "clear mandate that plan administrators follow plan documents to determine the designated beneficiary," death benefits shall be awarded to Edwards's "legal Surviving spouse." *Metro. Life Ins. Co. v. Marsh*, 119 F.3d 415, 420 (6th Cir. 1997). Because both Perry and Pack

claim to be the legal surviving spouse the Court must turn to Michigan law to determine which individual holds that status.

Plan administrators and federal courts frequently rely on state law to determine the identity of a participant's spouse for purposes of identifying the correct beneficiary. *Lee*, 462 F. App'x at 549. *See DaimlerChrysler Corp. v. Healthcare Benefits Plan v. Durden*, 448 F. 3d 918, 926–27 (6th Cir. 2006) (examining Ohio and Michigan law to determine which of the plan participant's spouses was the surviving spouse for beneficiary purposes); *Robinson v. New Orleans Emp'rs ILA AFL-CIO Pension Welfare Vacation & Holiday Funds*, 269 F. App'x 516, 518–19 (5th Cir. 2008) (*per curiam*) (applying Louisiana law to determine whether a plan participant's partner was the participant's "qualified surviving spouse"); *Malhiot v. S. Cal. Retail Clerks Union*, 735 F.2d 1133, 1135–36 (9th Cir. 1984) (examining California law to determine whether plan participant's partner was his "spouse" for purposes of assessing beneficiary status). Because the word "spouse" generally requires a marriage valid under state law, it makes sense to rely on state law to determine whether an individual may properly be considered a plan participant's spouse. *See Malhiot*, 735 F.2d at 1135. Applying this same logic in a factually analogous case, the Sixth Circuit found that "failure to rely on the state-law determination of the identity of [the plan participant's] lawful spouse would *conflict* with the plan documents' definition of spouse, which in turn would represent a failure to honor 'the

13

primacy of the written plan'" governing the award of benefits. *Lee*, 462 F. App'x at 549 (emphasis added) (quoting *Union Sec. Ins. Co. v. Blakely*, 636 F.3d 275, 276 (6th Cir. 2011)).

Because Edwards was domiciled in Michigan and both marriages at issue took place in Michigan, the Court will apply Michigan law to assess the respective validity of each marriage and thereby discern which person is the proper plan beneficiary. *See Durden*, 448 F.3d at 922 (collecting cases) (explaining that federal common law suggests courts should apply the law of the decedent's state of domicile to determine which of two conflicting marriages was valid).[3] *See also* Restatement (Second) of Conflict of Laws § 188 ("The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which . . . has the most significant relationship to the transaction and the parties."); Restatement (Second) of Conflict of Laws § 283 ("The validity of a marriage will be determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the spouses and the marriage . . . .").

---

[3] In determining which state's law to apply in an ERISA case the Sixth Circuit instructs that the analysis should be governed by choice-of-law considerations derived from federal common law. *Durden*, 448 F.3d at 922 (citing *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 570 (6th Cir. 2001)). Where there is no federal common law on point the Sixth Circuit uses the Restatement (Second) of Conflict of Law for guidance in making choice-of-law determinations. *Durden*, 448 F.3d at 923. Applying the Restatement would also support relying on Michigan to determine which of Edwards's two marriages is valid.

14

Under Michigan law, a marriage is "absolutely void" if "either party had a wife or husband living at the time of solemnization." Mich. Comp. Laws § 552.1. At first blush it would appear then that Edwards's second marriage to Pack was invalid *ab initio* (from the outset) because, based on the existing record, he was still married to Perry at the time he married Pack. But Michigan law also creates "a strong presumption of validity in favor of a later ceremonial marriage that is attacked on the ground that one of the parties was already married to another." *Durden*, 448 F.3d at 925 (citing *John Hancock Mut. Life Ins. Co. v. Willis*, 438 F.2d 1207, 1208 (6th Cir. 1971); *In re Estate of Adams*, 107 N.W.2d 764, 765 (Mich. 1961); *In re Estate of Pope*, 517 N.W.2d 281, 282 (Mich. App. 1994); *In re Estate of Williams*, 417 N.W.2d 556, 559 (Mich. App. 1987)). This presumption becomes "particularly strong" if children are born of the later marriage. *Durden*, 448 F.3d at 925 (citing *Adams*, 107 N.W.2d at 765–66). Critically, the Michigan Supreme Court has held that "the presumption favoring legality of the later marriage, if it were ceremonial, will prevail over the one which favors a continuance in force of the prior marriage." *Adams*, 107 N.W.2d at 766 (citing *Killackey v. Killackey*, 120 N.W. 680 (Mich. 1909); *Wagoner v. Wagoner*, 87 N.W. 898 (Mich. 1901); *Dixon v. People*, 18 Mich. 84 (Mich. 1869)).

This presumption of the later marriage's validity may be rebutted with "clear and positive proof to the contrary." *Adams*, 107 N.W.2d at 766. But it will not overcome this presumption of validity merely to

15

present testimony by the first spouse that her husband never attempted to divorce her, or that no record of a finalized divorce was found in the county where the decedent was known to have resided. *Durden*. 449 F.3d at 925 (citing *Doertch v. Folwell Eng'g Co.*, 233 N.W. 211, 211–12 (Mich. 1930)). The possibility remains that an absent spouse could have obtained a divorce elsewhere. *Durden*, 448 F.3d at 926 (citing *Williams*, 417 N.W.2d at 559). The presumption under Michigan law that a later marriage is valid rests on two underlying premises: (1) that the parties are innocent of bigamy; and (2) that there is regularity in the actions of officiating and licensing officers. *Adams*, 107 N.W.2d at 766. Additionally, policy considerations weigh in favor of "foster[ing] respectability" and protecting children of the marriage from the "taint of illegitimacy." *Id.*

Applying Michigan law, Edwards's second marriage, to Pack, which Perry concedes was "ceremonial and duly licensed," must be presumed valid. ECF No. 26, PageID.297. In fact, because the couple had children together the court must apply a "particularly strong" presumption of validity in favor of the Pack-Edwards marriage. *See Durden*, 448 F.3d at 925 (citing *Adams*, 107 N.W.2d at 765–66). The couple had four biological children together. ECF No. 24, PageID.201. Pack and Edwards also together fostered and adopted several children—some formally, and others informally. *Id.* Altogether, Pack testified that she and Edwards raised 23 children. *Id.*

16

The burden of overcoming this presumption of validity—"one of the strongest known to the law"—rests with Perry. But she has not produced "clear and positive proof" that the Edwards-Pack marriage is in fact invalid. *Adams*, 107 N.W.2d at 766. The only admissible evidence she cites in support of the invalidity of Edwards's later marriage is that Edwards was still married to Perry at the time he married Pack. ECF No. 24, PageID.178–79, 182 (Q: "What evidence do you have, if any, that Mr. Edwards'[s] marriage to Ms. Pack is not valid?" A: "Only that he was still married to me."). Standing alone, this testimony is not "clear and positive" evidence disproving the validity of Edwards's second marriage.

The Court notes that, as described above, Perry recently provided the Court with an affidavit from her and Edwards's daughter claiming that, while Edwards was in the hospital recovering from a stroke, he told his daughter he had never divorced Perry. ECF No. 26-2, PageID.311. But this statement by Edwards in his daughter's affidavit constitutes inadmissible hearsay and, as such, cannot be considered by the Court in deciding summary judgment. *See* Fed. R. Civ. P. 56(c)(4); *Wiley*, 20 F.3d at 225–26; *Myers*, 111 F.3d at 1283. Although the daughter claims to have audio or video recording of her conversation with Edwards, that footage was never provided to the Court.

The Court also notes Perry's new allegations that Pack abandoned—or even abused—Edwards during his last years. As an initial matter, the Court questions why Perry neglected to mention such

17

serious allegations in her testimony during the evidentiary hearing. When asked by counsel for the Fund what evidence she had that Edwards's marriage to Pack was invalid, and why she—rather than Pack—should receive the death benefits, Perry responded only that she remains married to Edwards. ECF No. 24, PageID.178–79, 182. The claims of elder neglect or abuse appear for the first time in Perry's supplemental briefing. *See* ECF No. 26.

Because this case is at the summary-judgment phase, the Court must focus on evidence, rather than allegations. Notably, although Perry's supplemental brief repeatedly claims that Pack neglected Edwards, the sworn affidavit submitted by Perry in support of that brief contains no such averments. *Compare* ECF No. 26 (Perry Supp. Br.) *with* ECF No. 26-1 (Perry Aff.). Additionally, the criminal docket attached to Perry's brief demonstrates only that Pack was charged with elder neglect or exploitation, and that those charges were later dismissed. ECF No. 26-3. Although the affidavit provided by Perry's daughter claims that Pack "never visited/cared for my father while [he was in a nursing home] and in fact abandoned him and failed to provide financial support," this Court finds that a reasonable jury would not consider these statements "clear and positive" evidence that the Edwards-Pack marriage was invalid. ECF No. 26-2, PageID.311. Such statements may be relevant to assessing the quality of the marriage between Pack and Edwards, but they do not go to the *validity* of the Edwards-Pack marriage.

18

Considering the absence of admissible "clear and positive" evidence that Edwards's marriage to Pack was invalid, and the fact that Perry is asserting the validity of her first marriage to Edwards while simultaneously admitting that she remains legally remarried to (although separated from) another person, the Court concludes that under Michigan law Pack is the "surviving spouse" for purposes of identifying the proper pension plan beneficiary.

This conclusion is further supported by Michigan Probate Code. The Estates and Protected Individuals Code, Mich. Comp. Laws § 700.2801(2)(d) explains that for purposes of the Code "a surviving spouse does not include . . . . (d) An individual who, at the time of the decedent's death, is living in a bigamous relationship with another individual." Because Perry remarried Mr. Day in 1998, she cannot, consistent with Michigan probate law, also claim that she remains Edwards's "surviving spouse."

In her supplemental briefing, Perry now contends that Pack cannot be a "surviving spouse" consistent with Michigan Probate Code because Edwards lived with Perry and her daughter between an unspecified date in 2015 or 2016 and October 2017, when he was moved to a nursing home in Indiana, and that Pack then failed to care for Edwards after his arrival in Indiana. ECF No. 26, PageID.306; ECF No. 24, PageID.177. Section 700.2801(2)(e) of the Michigan Probate Code specifically excludes from its definition of "surviving spouse" any individual who "for 1 year or

19

more before the death of the deceased person" deserted, willfully neglected, or was "willfully absent" from the decedent spouse. But hearing testimony from both Perry and Pack established that Edwards's sojourn with Perry and the former couple's daughter in Michigan was a temporary, mutually beneficial situation; a "visit." ECF No. 24, PageID.199–202; ECF No. 28, PageID.329. Nothing in the record establishes that Pack and Edwards did not see each other during this period. And Pack testified, to the contrary, that Edwards travelled back-and-forth between Michigan and Indiana (where she lived) during the time he was staying in Detroit. ECF No. 24, PageID.199–200. Further, the parties agree that Edwards was with Pack and her children in Indiana—rather than with Perry in Michigan—from the date he was discharged from the hospital in October 2017 following his stroke, and his death on August 1, 2018, with the exception of two days in 2018. *See* ECF No. 24, PageID.177–78, 200, 203; ECF No. 26, PageID.298.

Perry has not provided evidence—as opposed to argument—demonstrating that Pack was willfully absent from, deserted, or neglected Edwards for one year or more preceding the date of his death. *See* Mich. Comp. Laws § 700.2801(2)(e). Although the affidavit sworn by Edwards and Perry's daughter asserts that Pack abandoned Edwards at the end of his life, it states only that Pack never visited or cared for Edwards from the time he was moved to the Indiana nursing home in October 2017, ten months before his death in August 2018. *See* ECF No.

20

26-2, PageID.311–12. Accordingly, Perry has not presented evidence showing that Pack was absent from, deserted, or neglected Edwards "for 1 year or more before [his] death." Mich. Comp. Laws § 700.2801(e). Accordingly, Perry has not presented evidence showing that Pack could not be considered a "surviving spouse" under the definition of that term supplied by Michigan Probate Code. Regardless, the question of which Defendant is the "surviving spouse" for purposes of the Fund benefits cannot be determined solely on the basis of Michigan Probate Code.

ERISA requires courts to give written pension plan documents primacy in identifying the correct plan beneficiary. 29 U.S.C. § 1104(a)(1)(D); *Pressley*, 82 F.3d at 130. Here, the written plan documents supply their own definition of "surviving spouse" as "the Participant's legal Surviving Spouse to whom he had been married during the 1 year period preceding the Participant's date of death." ECF No. 20-2, PageID.124. To determine whether Perry or Pack is the "legal Surviving Spouse," the Court applies Michigan law. *See supra* at 14–15. That includes not only Michigan Probate Code, but also Michigan case law, which carries a "strong presumption of validity in favor of a later ceremonial marriage that is attacked on the ground that one of the parties was already married to another." *Durden*, 448 F.3d at 925. While the question of which Defendant is the "surviving spouse" may be somewhat unclear under Mich. Comp. Laws § 700.2801(2), it is plain that Perry has not presented "clear and positive proof" sufficient to overcome

21

the presumption that Pack and Edwards's marriage was valid. *Adams*, 107 N.W.2d at 766. For that reason, Pack—rather than Perry—should be considered the "surviving spouse."

## CONCLUSION

For these reasons, the motion for summary judgment filed by Plaintiff Trustees of the Roofers Local 149 Pension Fund is **GRANTED**. It is hereby **ORDERED** that Defendant Kaija Menyon Pack is the beneficiary of Charles Edwards, Jr.'s pre-retirement death benefits. Defendants are further **ENJOINED** from pursuing any action against Plaintiff for recovery of the benefit under 29 U.S.C. § 1132 or any other applicable section of ERISA. If Plaintiff wishes to pursue an award of attorney's fees in this case it must submit an additional motion for attorney's fees outlining the amount of fees it seeks and providing support for the reasonableness of those fees. The motion must be filed within 14 days of the date of this Order.

**SO ORDERED.**

Dated: May 18, 2020        s/Terrence G. Berg
                           TERRENCE G. BERG
                           UNITED STATES DISTRICT JUDGE